300 So.2d 716 (1974)
ELYRIA-LORAIN BROADCASTING COMPANY, an Ohio Corporation D/B/a Wrod Radio, and Travis C. Wallace, Appellants,
v.
NATIONAL COMMUNICATIONS INDUSTRIES, INC., (Formerly Morris Broadcasting Co., Inc.), a Florida Corporation, D/B/a Wdat Radio, Appellee.
No. U-163.
District Court of Appeal of Florida, First District.
September 5, 1974.
Rehearing Denied October 15, 1974.
*717 S. LaRue Williams, of Kinsey, Vincent, Pyle & Williams, Daytona Beach, for appellants.
Robert Abraham, of Raymond, Wilson, Karl, Conway & Barr, Daytona Beach, for appellee.
McCORD, Judge.
This is an appeal from an order denying appellants' motion to dismiss and strike appellees' complaint, appellants' motion for directed verdict, motion for judgment non obstante veredicto and motion for new trial in a slander action.
The appellants, Elyria-Lorain Broadcasting Company, d/b/a WROD radio, and Travis C. Wallace (hereinafter sometimes referred to as Elyria and Wallace, respectively) were defendants in a slander action brought against them by appellee National Communications Industries, Inc., d/b/a WDAT radio (sometimes hereinafter referred to as National). The facts out of which this cause of action arose began with a newspaper article which appeared in the evening edition of the Daytona Beach News Journal on May 5, 1971, which read:
"Ownership of Station WDAT to Change?
Morris Broadcasting Co., Inc., owner of radio station WDAT in Ormond Beach, will be transferred to National Services Industries, an Atlanta based holding company, as a result of a civil suit against William Morris, the Associated Press reported today.
The AP said Morris Broadcasting is one of four companies which Morris has agreed to turn over to NSI in a consent decree arising from an action charging that Morris defrauded a subsidiary of NSI of over $1 million.
The decree requiring Morris to turn over to NSI more than $1 million in assets says the transfer is to include Morris' Atlanta home, cars, real estate and his wife's diamonds.
William Hunter, vice president and general manager of WDAT, said he has filed Form 316 with the Federal Communications Commission for transfer of WDAT's license to him, but the FCC said today that Morris Broadcasting is still the license holder of record.
A new $60,000 home for WDAT is being completed on an 18 acre site adjacent to the Forest Hill subdivision on Nova Rd. in Ormond Beach. WDAT has been headquartered in the Riviera Country Club."
The following day, appellant Wallace, a radio advertising salesman for appellant WROD radio called upon Tom Harvey, a retail merchant and mutual advertising customer of WROD radio and WDAT radio. These two radio stations are competitors in and around Daytona Beach, Florida. The purpose of Wallace's visit was not to sell advertising to Harvey but to service his account. Harvey was an excellent customer of WROD and had seven or eight months left on his blanket contract with that station. He also advertised with appellee radio station. This slander action arose out of a conversation at that time between Wallace, Harvey and Carol Burns, Harvey's secretary. The discussion centered around the above quoted newspaper article. The exact words spoken by Wallace are in conflict. Carol Burns testified:
1. That defendant Wallace asked her if she had read the article, and that she replied that she had read it but did not understand it.

*718 2. That her employer (Harvey) came into the conversation and said he had not read it.
3. That defendant Wallace then said "something about WDAT is involved in a scandal, and it probably would go off the air."
4. That defendant Wallace then asked if Harvey had his spots (radio advertising) ready for June, and Mrs. Burns answered him in the negative, and that defendant Wallace then said:
"Well, if they're going off the air, how about putting your spots on my radio station?"
5. That Mr. Harvey:
"... was shocked. He didn't know anything about it. And of course, when Mr. Wallace says, `They were going off the air, put your spots with our station.'"
On cross examination, Mrs. Burns in essence, repeated her direct testimony. She confirmed that it was appellant Wallace who brought up the subject and volunteered the information that the appellee's radio station probably would go off the air.
Harvey, in his testimony, reinforced and amplified Mrs. Burns' testimony. He testified that appellant Wallace said:
"... that F.C.C. wouldn't sit still for it and would probably pull them off the air so the spot could be in jeopardy."
He testified:
"That is when I began to stop and think about the advertising that I was doing with them... . If I'm going to run a spot on the station, I want to be damned sure it's going to run for while, not just be off and on."
He gave the following response to the following questions:
"Q Did he make these statements, do you think in an effort to increase his advertising?"
"A I think if I had pulled my spot off, he knew I would go with WROD if I pulled the spots of DAT."
Appellant Wallace himself admitted that he instigated the conversation about the appellee's radio station, and also admitted:
"I did make the remark, that probably the FCC does draw a dim view to this corporation being  let's say being involved in this type of thing."
He failed to deny that he told Tom Harvey and Mrs. Burns that plaintiff's radio station would go off the air and that their advertising would not be carried:
"Q Did you say anything about the spots going off the air or about W.D.A.T. being closed down, or anything of that sort?"
"A I am not really sure whether it was to that effect or not. Whether it was to that they would be closed down, or probably to the effect that if the FCC wanted to they could revoke their license."
There being a question of fact as to the words used by appellant Wallace, the trial judge properly submitted the factual question to the jury under proper instructions as to slander per se and per quod. From its verdict, the jury apparently believed the version which would render the words slander per se under which special damages need not be proven  words to the effect that appellant Wallace said in addition to his other comments that the FCC would not stand still for this and would pull WDAT off the air and their (WROD's) spots would not be run.
The jury brought in a verdict of $1 nominal damages against each appellant, punitive damages against appellant Wallace in the amount of $5 and punitive damages against appellant Elyria in the amount of $5,000.
From our review of the record, we find no evidence of actual damages to appellee. The statements were made by Wallace to *719 only two persons  Tom Harvey and Carol Burns. The evidence affirmatively shows that although Wallace called on 42 other customers (15 of which were mutual customers of both WDAT and WROD) between the time the article appeared in the paper and the time suit was filed, Wallace made no mention of WDAT or the article to the 42 persons. There is no evidence that appellee lost any business or suffered any monetary loss whatsoever as a result of the statement. In Hutchinson v. Lott, Fla.App. (1st) 110 So.2d 442, this court in reviewing a judgment for $115 compensatory and $5,000 punitive damages stated:
"From our review of the record we find that assuming there had been a proper basis for actual damages as the jury sought to impose, the punitive damages sought to be imposed bear no reasonable relation thereto and are so great as to shock the judicial conscience and to indicate that the jury was influenced unduly by passion or prejudice, or labored under a misconception of the law."
Appellant urges that we adopt a principle of law which is applicable in some states that a verdict for nominal damages will not support a verdict for punitive damages. While such might be a proper result under some factual situations in a defamation case, it would not under others. We therefore, decline to adopt such a rule in this case.
When we consider, under the factual situation of this case, however, the relationship of the $5,000 punitive damages awarded to the $1 nominal damages, plus the relationship of the $5 punitive damages awarded against the employee who perpetrated the slander to the $5,000 award against his employer, who as far as the record shows had nothing to do with the slander, (its liability resulting only from the application of the doctrine of respondeat superior) we come to the inescapable conclusion that the $5,000 award of punitive damages against the employer is so grossly excessive as to shock the judicial conscience and indicates that the jury was unduly influenced by passion or prejudice or labored under a misconception of the law. The record does not sustain a verdict in excess of $500 punitive damages against Elyria but does sustain a verdict in that amount.
Reversed and remanded for a new trial of appellee's suit against both appellants, unless within 10 days after the mandate issues, appellee files a remittitur of $4,500 as to the $5,000 punitive damage verdict against appellant Elyria.
RAWLS, C.J., and JOHNSON, J., concur.